UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FULD**, *et al.*<br><br>    *Plaintiffs,*<br><br>**v.**<br><br>**THE ISLAMIC REPUBLIC OF IRAN**, *et al.*,<br><br>    *Defendants.* | **Case No. 20-cv-2444-RCL** |
| **ESTATE OF ARI FULD**, *et al.*<br><br>    *Plaintiffs,*<br><br>**v.**<br><br>**THE ISLAMIC REPUBLIC OF IRAN**, *et al.*,<br><br>    *Defendants.* | **Case No. 20-cv-3492-RCL** |

## MEMORANDUM OPINION

Ari Fuld was brutally stabbed in broad daylight. While shopping in the Gush Etzion Junction located in the West Bank near Jerusalem, Israel, Mr. Fuld was targeted by a Hamas militant wielding an eight-inch blade. The terrorist stabbed Mr. Fuld multiple times in the back and neck. Unsatisfied, the terrorist quicky advanced on his next victim—a woman employed at a nearby shop. Despite his fatal wounds, Mr. Fuld chased down and shot the terrorist before he could hurt anyone else. Shortly afterward, Mr. Fuld succumbed to his injuries. The terrorist was arrested, indicted, and convicted for the murder of Mr. Fuld and the attempted murder of others.

Mr. Fuld's estate and family now bring suit. They argue, like many plaintiffs before, that the Islamic Republic of Iran ("Iran") and the Syrian Arab Republic ("Syria") are liable for damages

1

from the attack because Iran and Syria provided material support and resources to Hamas—the terror organization that carried out the attack. Plaintiffs rely on causes of action stemming from provisions of the Foreign Sovereign Immunities Act ("FSIA"). 28 U.S.C. § 1605A(c). Plaintiffs have moved for a default judgment. After considering plaintiffs' motion and evidence, applying relevant case law, and taking judicial notice of related cases, the Court will **GRANT** plaintiffs' motion for default judgment against Iran and Syria and award damages accordingly.

## I.   PROCEDURAL HISTORY

This case was once two. The parents and siblings of Mr. Fuld initiated this suit against Iran and Syria on September 1, 2020. Compl., ECF No. 1. Three months later, Mr. Fuld's estate, widow, and four children filed a separate suit—against the same defendants for the same conduct. *Est. of Fuld v. Islamic Republic of Iran*, 20-cv-3492 (RCL) (D.D.C.) ("*Fuld II*"). In the complaints of both cases, jurisdiction and liability were premised on 28 U.S.C. § 1605A, which provides a private right of action to eligible victims of state-sponsored terrorism. Compl. ¶¶ 2–7; *Fuld II*, Compl. ¶ 2–7, ECF No. 1.

The two suits took parallel procedural paths. When other methods failed, service on defendants in each case was made via diplomatic channels, as authorized by 28 U.S.C. § 1608(a)(4). ECF No. 14; *Fuld II*, ECF No. 13. Still, defendants failed to acknowledge either suit. Thus, upon motions by plaintiffs, the Clerk of this Court entered default against both defendants in each case. ECF Nos. 20, 23; *Fuld II*, ECF Nos. 17, 20. Then, with judicial economy in mind, the Court consolidated the cases under Fed. R. Civ P. 42(a). *See* ECF No. 25.

Plaintiffs have now filed a motion for default judgment against defendants, Plaintiffs' Motion for Default Judgment as to All Defendants, ECF No. 27 ("Pls.' Mot."), accompanied by a memorandum that includes their legal arguments, Plaintiffs' Memorandum of Law with Points and

Authorities in Support of Plaintiffs' Motion for Default Judgment, ECF No. 27-1 ("Pls.' Mem."). Further, plaintiffs have attached hundreds of pages of exhibits outlining the extent of their injuries and evincing their right to relief. ECF Nos. 27-2 to 27-17. Thus, the Court must now evaluate whether the plaintiffs have met the prerequisites for a default judgment on liability and determine what amount of damages, if any, are appropriate. The Court's analysis begins with the applicable legal standard, proceeds to findings of fact, and ends with conclusions of law.

## II.    LEGAL STANDARD

To obtain a default judgment, plaintiffs must first establish their claim or right to relief by "evidence satisfactory to the court." *See* 28 U.S.C. § 1608(e); *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014). To assess whether plaintiffs have met that burden, a court shall consider evidence and make findings of fact. *Est. of Farhat v. Islamic Republic of Iran*, 19-cv-3631 (RCL), 2024 WL 706971, at *2 (D.D.C. Feb. 21, 2024). A district court retains discretion "to determine precisely how much and what kinds of evidence the plaintiff must provide" to establish her claim or right to relief. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014).

In resolving a motion for default judgment in an FSIA case, "the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (internal quotations and citation omitted), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020). Still, courts may not "simply accept a complaint's unsupported allegations as true." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp 2d 163, 171 (D.D.C. 2010). Instead, courts must "inquire further before entering judgment against parties in default." *Id.* (internal quotations omitted).

3

In making their case for a default judgment, plaintiffs must also prove that the district court has subject matter jurisdiction and personal jurisdiction over state defendants. *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 21 (D.D.C. 2019) (citing *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016)). Indeed, it is the plaintiffs' burden to demonstrate jurisdiction. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). If plaintiffs fail to meet this burden, their claims must be dismissed as "[a] default judgment rendered in excess of a court's jurisdiction is void." *Jerez*, 775 F.3d at 422.

## III.    FINDINGS OF FACT

Before this Court enters a default judgment against defendants, it will use "numerous evidentiary sources" to reach its own "independent findings of fact," notwithstanding prior cases that may involve similar issues. *See Rimkus*, 750 F. Supp 2d at 171–172. Courts commonly examine the full panoply of available evidence when assessing a motion for default in an FSIA case. For example, courts may rely upon plaintiffs' "uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (Lamberth, C.J.) (alteration in original) (quoting *Int'l Road Fed'n v. Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001)). A court may also "take judicial notice of related proceedings and records in cases before the same court." *See, e.g.*, *Rimkus*, 750 F. Supp 2d at 171 (internal quotations and citations omitted).

### A.    Judicial Notice

Plaintiffs request that the Court take judicial notice of its prior cases holding Iran and Syria liable for provision of material support to Hamas and adopt the findings of fact and conclusions of

law made in those cases. *See* Pls.' Mem. 8.[1] Under Federal Rule of Evidence 201(b), courts may take judicial notice of facts "not subject to reasonable dispute" that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). In FSIA cases, courts frequently take judicial notice of other proceedings "involving the same conduct by the same defendants." *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 11 (D.D.C. 2018). This is true "even when those proceedings have taken place in front of a different judge." *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)). In this way, "the FSIA does not require this Court to relitigate issues that have already been settled." *Brewer*, 664 F. Supp. 2d at 54.

That said, taking judicial notice of defendants' liability in one case does not necessarily establish the liability of defendants in another. *See Valore*, 700 F. Supp. 2d at 60. As this Court has explained before, "mere citation to another case is hardly sufficient to warrant a finding of liability." *Est. of Farhat*, 2024 WL 706971, at *2. This is particularly true where, as here, a new set of plaintiffs brings claims for a new attack. Notably however, these are not new defendants, and plaintiffs do not allege any novel connections between them. This Court has examined the relationship between Iran, Syria, and Hamas on a number of occasions and found defendants liable for several acts of terror. *See, e.g., Est. of Steinberg v. Islamic Republic of Iran*, No. 17-cv-1910

---

[1] In particular, plaintiffs request the Court take judicial notice of:

> *Botvin, et al. v. Islamic of Republic of Iran, et al.*, No. 05-cv-220 (RCL) (D.D.C.) ("Botvin I");
> *Goldberg-Botvin, et al. v. Islamic of Republic of Iran*, No. 12-cv-1292 (RCL) (D.D.C.) ("Botvin II"); *Roth, et al. v. Islamic Republic of Iran, et al.*, No. 11-cv-01377 (RCL) (D.D.C.) ("Roth");
> *Baxter, et al. v Islamic Republic of Iran, et al.*, No 11-cv-02133 (RCL) (D.D.C.) ("Baxter");
> *Steinberg, et al. v. Islamic Republic of* Iran, et. al. No. 17-cv-1910 (RCL) (D.D.C.) ("Steinberg");
> and *Henkin, et al. v. Islamic Republic of Iran*, et al., No. 18-cv-01273 (RCL) (D.D.C.) ("Henkin") -
> - as well as numerous other decisions handed down by this Court -- regarding providing material
> support for HAMAS over a prolonged period of time and also during the same time period as to the
> liability of [defendants].

Pls.' Mem. 8.

(RCL), 2019 WL 6117722, at *10 (D.D.C. Nov. 18, 2019) (holding Iran and Syria liable for a Hamas terrorist attack); *Henkin v. Islamic Republic of Iran*, No. 18-cv-1273 (RCL) (D.D.C. July 12, 2021) (same). The Court sees little reason to ignore its own cases. Thus, the Court will grant plaintiffs' motion for judicial notice. *See* Pls.' Mem. 8. However, the Court will not simply "adopt previous factual findings without scrutiny." *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 319 (D.D.C. 2014). Instead, the Court will use judicial notice of evidence in earlier cases as a supplement to plaintiffs' expert testimony,[2] affidavits, and other evidence in an effort to "reach [its] own independent findings of fact." *See Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010). In doing so, the Court will set forth facts establishing Iran and Syria's responsibility for this attack.

### B. The Attack

Ari Fuld was murdered in the fall of 2018, just three days before Yom Kippur, Judaism's most solemn day. *See* Miriam Fuld Decl. ¶¶ 3, 43, ECF No. 27-2. He lived with his wife, Miriam, in the West Bank near Jerusalem, Israel. ECF No. 27-6. In advance of the upcoming holiday, Miriam asked Ari to pick up some items from the store. Miriam Fuld Decl. ¶ 43. Ari left their home that Sunday morning and headed towards the popular Rami Levy supermarket at the Gush Etzion Junction located near an Israeli Jewish community that includes many Americans. *See*

---

[2] Testimony from experts is "of crucial importance in terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain," "[v]ictims of terrorist attacks . . . are often . . . unable to testify about their experiences," and "[p]erpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection." *Owens*, 864 F.3d at 787. As a result, "reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception." *Id.* The Court has reviewed the qualifications of Dr. Ronni Shaked and is satisfied that he is qualified to offer the opinions discussed below. *See* Shaked Decl. ¶¶ 3–27 (listing qualifications). Plaintiffs have also attached a copy of David Schenker's declaration, which was submitted to this Court in support of default judgment in *Baxter v. Islamic Republic of Iran*, No. 11-cv-2133 ("Schenker Decl."). *See* ECF No. 27-4. The Court once again finds Mr. Schenker qualified to provide expert testimony on Syrian state sponsorship of terrorism. Plaintiffs did not provide qualifications for their economic experts, Stephen M. Dripps and Chad L. Staller, but other courts in this district have examined their qualifications in previous cases. *See, e.g., Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 51 n. 1 (D.D.C. 2021) (McFadden, J.) (finding Dripps and Staller qualified to offer expert opinion on economic loss). Upon review, this Court, too, finds that Dripps and Staller are qualified to provide expert testimony on economic loss.

Compl. ¶ 37. That same morning in the southern West Bank, the terrorist, a teenager, left his village having told his mother that he was going out to exercise. Shaked Decl. ¶ 32, ECF No. 27-3. In truth, he left to try and kill Jewish people. *Id.* His mother would eventually recognize this and attempt to warn the authorities that her son intended to commit murders—but to no avail. *Id.* So, the terrorist spent that morning traveling to multiple locations in the West Bank in search of the optimal site and optimal target for his attack. *Id.* His goal was to find an English-speaking Israeli soldier of American origin. *See id.* ¶¶ 29, 32. Eventually, he did, and that was when Mr. Fuld's routine holiday shopping trip turned into a nightmare.

Mr. Fuld's murder was captured on surveillance footage. *Id.* ¶ 31. As he waited outside of a mall, Mr. Fuld was ambushed by the killer, who wielded an eight-inch knife intended for slaughtering animals. *See id.* ¶ 51; Pls.' Mem. 7. The teenaged terrorist impaled Mr. Fuld multiple times in the upper back and neck. Pls.' Mem. 7. The blade severed Mr. Fuld's artery and went directly into his lungs. Mirian Fuld Decl. ¶ 45. Immediately after the stabbing, the terrorist sprinted towards his next target—a woman who worked as a local shop employee nearby. *See* Pls.' Mem. 7. But Mr. Fuld refused to go down without a fight. Bloodied and maimed, Mr. Fuld chased down and shot the terrorist before he was able to harm anyone else. *See id.* Mr. Fuld was then transported to the hospital but died from his wounds in the ambulance. *Id.* at 34. The terrorist, however, survived and was subsequently arrested, indicted, and convicted in Israeli Military Court for the murder of Mr. Fuld and the attempted murder of others. *Id.* at 34–36.

## C.   Hamas Responsibility for the Attack

The Court finds satisfactory evidence in the record to establish that Hamas was responsible for the attack that killed Mr. Fuld.

First, history suggests that Hamas is responsible for this attack. Hamas is a political and military entity designated as a terrorist organization by the United States. *See* U.S. Dept' of State, Bureau of Counterterrorism, *Foreign Terrorist Organizations*, https://www.state.gov/foreign-terrorist-organizations/ [https://perma.cc/YC8D-RT8V] (last visited Mar. 27, 2024). Indeed, Hamas is the most deadly and destructive Palestinian terrorist organization in the world. *See* Shaked Decl. ¶ 43. Hamas is active in both Palestinian territories near Israel: the Gaza Strip and the West Bank. *Id.* ¶ 50. After Israel withdrew its troops from the Gaza Strip in 2005, Hamas gained control of this coastal region. *See id.* ¶ 49. Control over the West Bank, however, is divided between Israel and the Palestinian National Authority, a bitter rival of Hamas. *See id.* ¶ 50. Despite its lack of governing authority in the region, Hamas's terrorist activities have continued in the West Bank. *Id.*

From its inception in 1987, Hamas has believed that the Israel-Palestine conflict can only be resolved through holy war and has accordingly orchestrated numerous terrorist attacks against civilians. *See* Shaked Decl. ¶ 44. To promote, plan, and carry out these attacks, Hamas established a military wing called the Ezzdeen Alqassam Brigades also known as the Al-Qassam Brigades. *See id.* ¶ 46. Established in 1990, the Al-Qassam Brigades have carried out thousands of terrorist attacks to date, including suicide bombings, rocket launches, and stabbings. *Id.* In 2018, stabbing attacks became the most common type of Hamas attack in the West Bank and Israel. *Id.* ¶¶ 98–99. This trend was a part of Hamas's larger effort to encourage more "lone wolf" attacks—attacks from individual terrorists not acting within a terrorist cell. *See id.* ¶¶ 97, 100. Hamas recruits some of its lone wolf operatives at high schools and university campuses. *Id.* ¶ 95. In 2018 there were a total of 22 terrorist stabbing attacks in Israel—Mr. Fuld was the ninth civilian victim of a terrorist stabbing attack that year. Compl. ¶ 35. The unprompted stabbing of Mr. Fuld, in the West Bank,

by a high school student, acting alone, just as that sort of lone wolf attack became the preferred method for terrorists, is strong evidence of Hamas's handiwork.

Second, Hamas's public messaging after Mr. Fuld's murder is further evidence of its responsibility for the attack. Hamas is not bashful about taking responsibility for heinous attacks. *See* Compl. ¶ 36. To the contrary, Hamas frequently boasts about its terrorism and publicizes its responsibility for attacks with written announcements, pictures, videos, internet posts, and through other means. *See id.* ¶¶ 109, 133. Here, within a few hours of Mr. Fuld's murder, Hamas's official website, the Palestinian Information Center, reported that "Hamas praised the attack and said that it comes in response to Israel's ongoing violations at al-Aqsa Mosque and confirms the fact that resistance is the Palestinians' only choice." Pls.' Mem 20. Three months later, Hamas more explicitly took responsibility for the attack with a video published on the official website of the Al-Qassam Brigades. Shaked Decl. ¶ 109. That video listed the attack as among "[t]he Significant attacks of [Hamas] in the West Bank during 2018." *Id.* ¶ 116. And again, after he was sentenced to life imprisonment, another post supporting the killer was made on the official website of Al-Qassam Brigades. *Id.* ¶ 118. These are just a few of the most obvious examples; Dr. Shaked also cites a number of other online materials as indicative of Hamas's responsibility for the attack. *Id.* ¶¶ 133–134.

Third, according to Dr. Shaked, details of the terrorist's placement within the prison where he is incarcerated is dispositive of Hamas's responsibility for the attack. He explains that:

> [i]n the Israeli prisons, where Palestinian terrorists are incarcerated, there is complete separation between Palestinian prisoners from one organization, such as Hamas, and prisoners from other organizations, such as Fatah. The separation reflects the hostile relationship and rivalry between Hamas and Fatah []. The separation was carried out by the Israeli prison authorities in order to prevent friction and quarrels, even bloody quarrels between the prisoners of the various organizations, in order to facilitate the prison authority in its mission . . . It is totally, if not entirely, impossible to find a Fatah prisoner in the Hamas wing or a Hamas

prisoner in the Fatah wing. Therefore, the wing or cell of imprisonment . . . is solid
proof, without a doubt, that indicates the prisoner's organizational identity.

*Id.* ¶ 41. With this understanding, Dr. Shaked confirmed from multiple sources that the killer is

held in the Hamas wing of his prison—further establishing his link with Hamas. *Id.* ¶ 135.

Several other facts prove Hamas's responsibility for the attack. Among these facts are the

killer's vile statements in court that it was his "duty" to "free[] the world and humanity from a

dirty and bastard Jew." *Id.* at ¶ 51. Dr. Shaked declares that statement to be firm evidence of Hamas

indoctrination. *Id.* Dr Shaked further believes that the killer was indoctrinated and recruited to

Hamas through his high school. *Id.* at ¶ 95. And Dr. Shaked also testified that the killer's

"determination to perform the murder with a long knife, usually used for slaughtering animals" is

additional evidence of Hamas culpability. *Id.* at ¶ 51. Finally, the timing of the attack, near the

15th anniversary of the Oslo Accords—an agreement Hamas seeks to eradicate—is also evidence

that Hamas is responsible for the attack. *Id.* at ¶ 51. These facts, among others, led Dr. Shaked to

conclude "in [his] professional opinion beyond any reasonable doubt that the terrorist attack in

which Ari Fuld was murdered was planned and carried out by the Al-Qassam Brigades—the

Hamas terrorist branch." *Id.* at ¶ 52.

The Court is satisfied that the evidence in this case and plaintiffs' expert testimony

sufficiently establish that Hamas is responsible for the murder of Mr. Fuld.

### D.  Iran's and Syria's Provision of Material Support and Resources for Hamas

Both Iran and Syria have long been designated state sponsors of terrorism by the United

States Department of State. *See State Sponsors of Terrorism*, U.S. Dep't of State,

https://www.state.gov/state-sponsors-of-terrorism/ [https://perma.cc/9NTB-HNBT] (last visited

Mar. 27, 2024). Both countries "share an affinity for anti-Israel terrorist organizations." *See Baxter*

*v. Islamic Republic of Iran*, No. 11-cv-2133 (D.D.C. Jan. 17, 2017), Schenker Decl. 5. Unsurprisingly, this affinity for antisemitic terror groups extends to Hamas.

For decades, Iran has provided significant aid to Hamas in the form of financial support, weapons, and military training. *See* Shaked Decl. ¶ 52; *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 14 n.4 (D.D.C. 2009) ("HAMAS . . . is an organization that has been supported over the years by the Islamic Republic of Iran."). Indeed, since the 1990s, hundreds of Hamas terrorists have undergone intensive training in Iranian camps. Shaked Decl. ¶ 61. This continued through 2018—the year of the Mr. Fuld's murder—and into 2019. *Id.* ¶ 81. And Iranian leaders encourage and facilitate their country's provision of assistance to Hamas. Just a few months before the murder of Mr. Fuld, in December of 2017, Qassem Suleimani—a commander in Iran's military—said that "Iran will provide and allocate to Hamas all the resources needed to fight against Israel." *Id.* ¶ 89.

Hamas and its leaders have also received substantial material support and resources from Syria, including among other things: operational and logistical support for its militants in the West Bank and Gaza, safe haven for its leadership in Damascus, the training of its militants, safe passage and transit across Syrian territory, and the provision of financial assistance as a matter of state policy. *See Baxter v. Islamic Republic of Iran*, No. 11-cv-2133, Schenker Decl. 19; *see also Henkin v. Islamic Republic of Iran*, 18-cv-1273 (RCL) 2021 WL 2914036, at *2 (internal citations omitted) (D.D.C. July 12, 2021) (explaining how Hamas has used Syria as a safe haven for years, including situating its main office in Damascus and how Syria provided Hamas with funding and training). Further, "while Syria no longer supports Hamas because of Hamas's support for rebel forces in the Syrian civil war, Hamas continues to use the tactical know-how which Hamas gained while under Syrian protection." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 71–72 (D.D.C. 2017) (internal quotations omitted); *Roth v. Syrian Arab Republic*, No. 1:14-cv-1946 (RCL), 2018

WL 4680270, at *3 (D.D.C. Sept. 28, 2018) (Lamberth, J.) ("Although Syria no longer provides support to Hamas, Hamas benefitted from the substantial support that it received from Syria.").

The Court need not expound further on Iranian and Syrian support for Hamas. In many cases, this Court and others have found Iran and Syria responsible for providing logistical and financial support to Hamas and have held Iran and Syria liable for providing support under the FSIA. *See, e.g., Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200, 206 (D.D.C. 2008) (Lamberth, C.J.) ("Hamas is an organization supported by Iran . . . ."); *Roth*, 2018 WL 4680270, at *3 (Lamberth, J.) (detailing Syria's historical support for Hamas); *Belkin*, 667 F. Supp. 2d at 14 n.4 (Friedman, J.) ("Hamas . . . is an organization that has been supported over the years by the Islamic Republic of Iran."). The facts here support the same findings. The evidence in this case establishes, once again, that Iran and Syria have provided material support and resources to Hamas. Because defendants enabled, encouraged, and facilitated the attack here, the Court's findings of fact reflect that Iran and Syria are responsible for the murder of Mr. Fuld.

### E. Plaintiffs' Status and Injuries

The Court now makes findings of fact regarding each plaintiff, including the injuries that they have suffered due to the killing of Mr. Fuld.

#### 1. Estate of Ari Fuld

Ari Fuld was killed in the stabbing attack that formed the basis for this suit. Pls.' Mem. 8. He was born in New York, New York, and was a citizen of the United States. Miriam Fuld Decl. ¶ 2. He was 45 years old when he died. Ari Econ. Loss Rep., ECF No. 27-5 at 3. His estate is represented in this litigation by his wife, Miriam Fuld, who was duly appointed as the Administrator of his Estate pursuant to Letters of Administration issued by the Surrogate's Court of the State of New York, Kings County, on January 31, 2020. Miriam Fuld Decl. ¶ 2.

### 2. Miriam Fuld

Miriam Fuld was married to Ari. *Id.* ¶ 4. Ari was her "better half." *Id.* Miriam and Ari have known each other since they were teenagers. *Id.* ¶ 8. They were born just a few hours apart from one another, so they often celebrated their birthdays at the same time. *Id.* ¶ 14. Miriam and Ari "did everything together," but "not in a crazy way." *Id.* ¶ 17. Miriam was deeply affected by Ari's murder, and she says that "[t]he day he was killed is the day [her] life ended." *Id.* ¶ 4. In the aftermath of Ari's murder, Miriam began going to therapy with Dr. Hadassa "Dassi" Jacobson and began reflexology and massage therapy with Aviva Danziger. *Id.* ¶¶ 68–72. Despite her treatment, she continues to "hold a lot of traumas in [her] body as a result of the attack." *Id.* She experiences chests and shoulder pain, headaches, sleeplessness, stress, and anxiety. *Id.* Miriam no longer works, and she is not sure if she will ever be able to work again. *Id.* ¶ 71. Miriam carries Ari's death with her "every second of every minute of every hour, every single day." *Id.* ¶ 8.

### 3. Harvey Jonas "Yonah" Fuld

Yonah Fuld is Ari's father. Yonah Fuld Decl. ¶ 2, ECF No. 27-7. Yonah Fuld was born on February 4, 1943 in the Bronx, New York, and has been at all times since his birth, a citizen of the United States of America. *Id.* ¶ 2. Ari was an amazing son to Yonah. *Id.* ¶ 4. On the day of Ari's murder, Yonah received a call from his daughter in law, Miriam, asking him to come to the hospital. *Id.* ¶ 8. By the time he arrived, it was too late. *Id.* Yonah was asked by the hospital staff if he wanted to see the body of his dead son, but he refused, and he encouraged his wife to refuse as well. *Id.* ¶ 8. In his view, it is "best to remember our loved ones as they were in life and not to be left with the memory of a lifeless body." *Id.* After Ari's death, Yonah became "a changed person and a shell of the human [he] once was. *Id.* ¶ 9. When he thinks of Ari, Yonah is overtaken by "ever-present grief, stress, anxiety, fear and depression and rendered effectively catatonic." *Id.*

¶ 10. The fact that he "was forced to bury [his] own son looms like a dark shadow deep in [his] heart" and "nothing can change the brutal reality that [his] heroic son, Ari, is dead." *Id.* ¶¶ 10–12.

### 4. Mary Alice Fuld

Mary Fuld is Ari's mother. Mary Fuld Decl. ¶ 2, ECF No. 27-8. Mary was born on October 29, 1947, in Nykoping, Sweden, and has been at all times since her naturalization in 1955, a citizen of the United States of America. *See id.*; Mary Fuld Passport, ECF No. 27-8, Exhibit A. As a mother, if there was anything Mary ever needed, "Ari was there to provide." *See* Mary Fuld Decl. ¶ 11. To this day, Mary cannot believe that Ari was killed. *Id.* ¶ 19. Mary regrets that her husband, Yonah, stopped her from seeing Ari's body in the hospital, and this remains a point of contention in their marriage. *Id.* ¶ 21. Since Ari's death, Mary has developed several "triggers that cause [her] to suffer severe emotional distress." *Id.* ¶ 27.

### 5. Daniel Yaakov "Doni" Fuld

Doni Fuld is Ari's older brother. Doni Fuld Decl. ¶ 2, ECF No. 27-9. Doni Fuld was born on May 19, 1970 in New York, New York, and has been at all times since his birth, a citizen of the United States of America. *Id.* ¶ 2. Doni was three years old when Ari was born, and he recalls Ari being a "ball of energy" from birth. *Id.* ¶ 4. The day Ari was murdered was an emotional "rollercoaster" for Doni. *Id.* ¶ 17. The news of Ari's death brought both physical and emotional turmoil. When Doni arrived at the hospital he began shaking and crying and "felt [his] skin crawling, as well as the sensations of [his] bones breaking and sharp knifing pains." *Id.* ¶ 18. Further compounding his grief was the fact that Doni and Ari have looked like twins since they were children. *Id.* ¶ 4. Since Ari's death, Doni has constantly been approached in New York and Israel by people recognizing him as Ari's brother—some even thinking he is Ari. *Id.* ¶ 20.

### 6.  Hillel Chaim Shlomo Fuld

Hillel Chaim Shlomo Fuld is Ari's younger brother. Hillel Fuld Decl. ¶ 2, ECF No. 27-11. Hillel Fuld was born on November 13, 1978 in New York, New York, and has been at all times since his birth, a citizen of the United States of America. *Id.* Ari was 6 years old when Hillel was born. *Id.* Hillel recalls that he, Ari, and Eytan grew up in the same house for most of their childhoods and that they "were stuck together." *Id.* ¶ 8. Hillel was in denial when he learned of Ari's murder. *Id.* ¶ 13. Hillel "couldn't even look at a picture of [Ari's] face on the internet, as that would have forced [Hillel] to confront the reality of the situation, so seeing [Ari's body] in person was not something [Hillel] was able to do then, nor is it something [he] would do now." *Id.* ¶ 14. Hillel did not attend Ari's funeral, and he feels like he has not fully processed the fact that Ari died. *See id.* ¶ 16. Since the attack, Hillel has been seeing a therapist to get treatment for post-traumatic stress disorder ("PTSD"). *Id.* ¶ 26. When Hillel hears about a terrorist attack, his PTSD flares up, he has a difficult time breathing, and he does not know how to cope. *Id.* ¶ 27. He feels "hopeless, lost and in despair." *Id.* The only thing he feels like he can do to return to his life is to try and pretend that the attack did not happen. *Id.*

### 7.  Eytan Fuld

Eytan Fuld is Ari's youngest brother. Eytan Fuld Decl. ¶ 2, ECF No. 27-10. Eytan Fuld was born on June 28, 1984 in New York, New York, and has been at all times since his birth, a citizen of the United States of America. *Id.* Ari was 11 years old when Eytan was born, and Eytan recalls that when they were kids, Ari would often carry him on his shoulders. *Id.* ¶ 4. Additionally, Eytan fondly remembers swimming with Ari. *Id.* ¶ 5. True to his nature, "Ari was always the first to jump in the water," as Ari was "fearless and fun." *Id.* Despite their age difference, Eytan and Ari were close. *Id.* ¶ 14. The days following Ari's murder were a blur for Eytan. *Id.* ¶ 19. He was

in complete shock. *Id.* When Eytan thinks about Ari or his murder, Eytan "get[s] anxious, [his] heart pounds and [he] is overcome with extreme sadness." *Id.* ¶ 20. These days, when Eytan swims, he pushes himself "hard." *Id.* Eytan finds this to be a method of release, and "finding ways to release is the only way [he] ha[s] found to cope with Ari's murder and the aftermath that [his] family lives with every day." *Id.*

### 8. Tamar Fuld Bisley

Tamar Fuld is oldest of four children born to Ari and Miriam Fuld. Tamar Fuld Decl. ¶ 2, ECF No. 27-15. Tamar was born on March 12, 1996, in Jerusalem, Israel, and has been at all times since her birth, a citizen of the United States of America. Tamar Consular Report of Birth Abroad, ECF No 27-15, Exhibit A. Tamar is very proud to be the daughter of Ari Fuld. *Id.* ¶ 4. Growing up, she was a "daddy's girl." *Id.* ¶ 12. To her, Ari was like superman, he was her security blanket and her safety net. *Id.* ¶ 5. Anytime there was danger, Ari knew exactly what to do. *Id.* ¶ 10. The morning before her father was murdered, Tamar does not feel like she was a good daughter. *Id.* ¶ 13. She was not in a good mood, so she did not leave her room to tell Ari good morning before he left. *Id.* She feels guilty about that. *Id.* ¶ 34. Tamar feels like if she had said good morning, perhaps her father would not have been in the location of the attack at the exact time it occurred and perhaps he would not be dead. *Id.*

After the attack, Tamar rushed to the hospital where she then saw her father's lifeless body. *Id.* ¶ 21. She considers this to be a big mistake, because that image scared her and haunts her to this day. *Id.* Further adding to Tamar's grief are the social media responses to her father's murder. *See id.* ¶ 31. When Ari died, Tamar and her family received hate mail and saw many comments suggesting that it was a good thing that her father had was killed and proclaiming that he should burn in hell. *Id.* Tamar has met with multiple therapists and a psychiatrist who diagnosed her with

PTSD and anxiety. *Id.* ¶¶ 36–37. Sometimes Tamar momentarily forgets about Ari's murder and calls his phone to let him know about something that has happened, before realizing that he is dead. *Id.* ¶ 39. Since the attack, Tamar has felt like there is a piece of her that is missing. *Id.* ¶ 38.

### 9.   Naomi Fuld Ettinger

Naomi Fuld Ettinger is the second oldest of four children born to Ari and Miriam Fuld. Naomi Fuld Decl. ¶ 2, ECF No. 27-14. Naomi was born on July 17, 1997, in Jerusalem, Israel, and has been at all times since her birth, a citizen of the United States of America. Naomi Consular Report of Birth Abroad, ECF No 27-14, Exhibit A. To Naomi, prior to his death, Ari was always the fun one in the family. *Id.* ¶ 4. Naomi watched the video of her father's murder about nine or ten times because she wasn't able to believe the fact that it actually happened. *Id.* ¶ 11. Following the attack, she could not sleep well for months. *Id.* ¶ 12. Naomi tried therapy, but she did not feel like the therapist really understood how she dealt with grief. *See id.* ¶ 17. As a result, Naomi "started smoking cigarettes and marijuana as a way of self-medicating." *Id.* ¶ 18. She also stopped eating which caused more health issues. *Id.* ¶ 19. She can no longer find joy in life, and she does not like doing anything. *Id.* ¶ 25. She is miserable. *Id.* ¶ 26.

### 10. Eliezer "Yakir" Fuld

Yakir Fuld is the third oldest of four children born to Ari and Miriam Fuld. Yakir Fuld Decl. ¶ 2, ECF No. 27-16. Yakir was born on November 27, 2000, in Jerusalem, Israel, and has been at all times since his birth, a citizen of the United States of America. Yakir Consular Report of Birth Abroad, ECF No 27-16, Exhibit A. When Yakir heard that his father had been murdered, he blacked out. Yakir Fuld Decl. ¶ 9. Yakir tried therapy once or twice, but was never consistent with it. *Id.* ¶¶ 18–19. Yakir felt it was his responsibility to "push forward" to honor his father's legacy. *Id.* ¶ 20. Now, Yakir serves as a machine gunner in the Israel Defense Forces, the same job Ari

had. *Id.* ¶ 24. When he finished his training and received his beret, the pain from his father's absence outweighed the joy he should have felt. *Id.* ¶ 25. Yakir hates that he cannot let his father know that he is continuing in his footsteps. *Id.* ¶ 24. Yakir doesn't like to admit that his father's death has impacted his relationships—romantic and otherwise. *Id.* ¶ 27. He has had trust issues and has resisted getting close to others. *See id.* He is afraid to lose somebody again. *Id.* Since Ari's death, Yakir has come to believe that "more people to love means more people to lose." *Id.*

### 11. N.F.

N.F. is represented in this case by Miriam Fuld, his mother and natural guardian.[3] Miriam Fuld N.F. Decl. ¶ 2, ECF No. 27-13. N.F. is a minor and the youngest of four children born to Ari and Miriam Fuld. *Id.* N.F. was born in Jerusalem, Israel, and has been at all times since his birth, a citizen of the United States of America. N.F. U.S. Consular Report of Birth Abroad, ECF No. 27-13, Exhibit A. N.F. grew up admiring his father Ari and wanted to be like him. Miriam Fuld N.F. Decl. ¶ 4. Ari would come to every baseball game that N.F. played in. *Id.* After Ari's death, N.F. would think of Ari every time he went on the field or went up to bat. *Id.* ¶ 6. Eventually he stopped playing baseball. *Id.* N.F. was only 12 years old when Ari was murdered. *Id.* ¶ 12. Worse still, the attack happened while Ari was helping N.F. prepare for his Bar Mitzvah, and while N.F. still managed to enjoy the event, it was hard for him because his father was not there. *Id.* ¶ 13. When N.F. thinks about his father he becomes very upset, gets a headache, and feels tension in his muscles. *Id.* ¶ 15. Some days in the year are particularly challenging for N.F. such as the High Holidays, which coincide with the anniversary of Ari's murder. *Id.* ¶ 17.

---

[3] Plaintiffs' Complaint refers to this plaintiff as "N.S.F.," *Fuld II*, Compl. 1. However, plaintiffs' motion for default judgment, accompanying memorandum, and affidavits refers to him as "N.F." or "NF." Pls.' Mot. 1; Pls.' Mem. 65; Miriam Fuld N.F. Decl. ¶ 2. For consistency, and because each of these variations refer to the same person, the Court will simply use "N.F." going forward.

## IV.    CONCLUSIONS OF LAW

### A. Subject Matter Jurisdiction

Before the Court can assess the merits of plaintiffs' case, it must assure itself that it has jurisdiction to entertain plaintiffs' claims. *See, e.g., Cornish v. Dudas*, 715 F. Supp. 2d 56, 60 (D.D.C. 2010). Moreover, it is plaintiffs' burden to prove subject matter jurisdiction. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). In cases like this one, an assortment of provisions of the FSIA and related statutes set forth the criteria for the Court's subject matter jurisdiction. Those criteria can be reduced to three categories: (1) grant of original jurisdiction, (2) waiver of sovereign immunity, and (3) the statutory requirements for a claim to be heard. Before assessing liability or damages, the Court will first satisfy itself of each of these jurisdictional requisites.

### 1.   Grant of Original Jurisdiction

The FSIA grants United States district courts "original jurisdiction without regard to amount in controversy of any [(1)] nonjury civil action [(2)] against a foreign state . . . [(3)] as to any claim for relief in personam [(4)] with respect to which the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a).

First, plaintiffs have not requested a jury trial, nor are they entitled to one, as this is a case under the FSIA. Compl. ¶ 115; *Fuld II*, Compl. ¶ 115; *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30, 40 (D.D.C. 2002) ("[C]laims under the FSIA are not eligible for resolution by a jury . . . ."). Second, plaintiffs have sued Iran and Syria, both of which are considered a foreign state. Compl. ¶ 1; *Fuld II*, Compl. ¶ 1. Third, this lawsuit is against Iran and Syria in personam, not against their property. *Cf. Gang Luan v. United States*, 722 F.3d 388, 399 n.15 (D.C. Cir. 2013) ("*In personam* jurisdiction is jurisdiction over the defendant. *In rem* jurisdiction is jurisdiction over the property."). Fourth and finally, as discussed below, Iran

and Syria are not entitled to immunity from this suit. Accordingly, because this is a nonjury civil action against foreign states for relief in personam to which the defendants are not immune, the Court has original jurisdiction over these cases.

### 2.  Waiver of Sovereign Immunity

Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). Since federal courts must consider issues of subject matter jurisdiction *sua sponte*, *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012), a district court adjudicating FSIA claims must decide whether an exception to immunity applies "even if the foreign state does not enter an appearance," *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 & n.20 (1983). Among the several exceptions to foreign sovereign immunity is the FSIA's terrorism exception, which states that a foreign state has no immunity:

> in any case . . . in which [1] money damages are sought [2] against a foreign state [3] for personal injury or death [4] that was caused [5] by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1).

Each element of this section is met. Plaintiffs here seek money damages against the foreign states of Iran and Syria. Pls.' Mem. 34–36. And these damages are premised on plaintiffs' allegations of personal injury and death. *Id.* Notably, the FSIA does not restrict the personal injury or death element to injury or death suffered directly by the claimant; instead, such injury or death must merely be the basis of a claim for which money damages are sought. 28 U.S.C. § 1605A(a)(1). In other words, defendants are not immune from suit from the family members of Mr. Fuld simply

20

because those family members were not also stabbed and killed. The *source* of their injuries is what is material. The family member plaintiffs' various emotional and financial injuries flow from the death of Mr. Fuld. Thus, all plaintiffs have sought money damages against a foreign state for personal injury or death as required by the FSIA. *See* Pls.' Mem. at 87–88.

As to causation, as the Court has explained before, "there is no 'but-for' causation requirement" for claims made under the FSIA. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 42 (D.D.C. 2009) (Lamberth, C.J.). Instead, the causation element under the FSIA requires a showing of proximate cause. *See Owens*, 864 F.3d at 798 ("Nothing in the FSIA, however, requires a greater showing of intent than proximate cause."). To show proximate cause, plaintiffs must merely establish a "reasonable connection" between the behavior of the defendant and the damage suffered by plaintiffs. *Id.* at 794. To establish that "reasonable connection," plaintiffs must show that defendants' actions were "a substantial factor in the sequence of events that led to [their] injury" and that plaintiffs' injuries were "reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Id.* (cleaned up).

Here, plaintiffs present evidence of many reasonable connections between the defendants' behavior and plaintiffs' death and injuries. Plaintiffs argue that the governments of Iran and Syria supported Hamas financially, operationally, and militarily. *See* Pls.' Mem. 26–33. Plaintiffs further argue that the level of support and coordination Iran and Syria provided was a substantial factor in the sequence of events contributing to the death of Mr. Fuld and the injuries to his family. *See id.* As this Court has acknowledged before, "[d]eath, injuries, and trauma are obviously reasonably foreseeable results of a terrorist attack. Indeed, those are *goals* of a terrorist attack of this sort." *Est. of Farhat*, 2024 WL 706971, at *8. In light of the facts found by this Court, plaintiffs have

cleared "the relatively low proximate cause bar imposed by the FSIA" and have sufficiently alleged causation. *See Est. of Steinberg*, 2019 WL 6117722, at *4.

Plaintiffs further allege that defendants are responsible for the provision of material support and resources for an extrajudicial killing. Pls.' Mem. 14. More specifically, plaintiffs allege that defendants provided material support to Hamas, who killed Mr. Fuld. *Id.* The FSIA defines "material support or resources" as:

> any property, tangible or intangible, or service, including *currency or monetary instruments* or financial securities, financial services, *lodging, training, expert advice or assistance, safehouses*, false documentation or identification, communications equipment, *facilities, weapons*, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1) (emphases added); *see* 28 U.S.C. § 1605A(h)(3) (adopting definition of "material support or resources" found in 18 U.S.C. § 2339A). These material support or resources must have been provided "by an official, employee, or agent of [the] foreign state" acting in the scope of her "office, employment, or agency." 28 U.S.C. § 1605A(a)(1). Plaintiffs satisfy this element. Plaintiffs' evidence and this Court's prior cases establish the top-down persistent efforts of Iran and Syria to provide substantial finances, training, weapons, assistance, and safe haven to members of Hamas—thereby encouraging and facilitating extrajudicial killings like the one in this case. *See Supra* Part III.D. That is more than enough.

Further, plaintiffs have alleged an extrajudicial killing. An "extrajudicial killing" contains three elements: "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770. By that definition, the deliberate and unauthorized murder of Mr. Fuld was a quintessential extrajudicial killing. *See Est. of Steinberg*, 2019 WL 6117722, at *5 (noting that in "paradigm FSIA cases . . . innocent civilians are unsuspectingly murdered by terrorists."). In assessing sovereign immunity, it is immaterial that the family member plaintiffs in this case were not also killed. *Cf. Salzman v.*

*Islamic Republic of Iran*, No. 17-cv-2475 (RDM), 2019 WL 4673761, at *12 (D.D.C. Sept. 25, 2019) ("The plain text of the statute requires that the claimed injury be '*caused by an act of* . . . extrajudicial killing,' not that the injury be an extrajudicial killing itself." (citing with emphasis 28 U.S.C. § 1605A(a))). Thus, plaintiffs have sufficiently alleged that Iran and Syria—through Hamas—provided material support and resources for an extrajudicial killing.

Accordingly, because plaintiffs have sued a foreign state for the provision of material support and resources for an extrajudicial killing which caused personal injury and death for which money damages have been sought, the FSIA's terrorism exception is applicable, and defendants cannot be immune from suit.

### 3.  Requirement For a Claim To Be Heard

A federal district court "shall hear a claim" under the FSIA's terrorism exception when certain conditions are met. 28 U.S.C. § 1605A(a)(2). Two conditions are relevant here: (i) that the foreign state was designated a state sponsor of terrorism at the time of the act giving rise to liability or was so designated in response to the act and remains so designated; and:

> (ii) the claimant or the victim was, at the time the act . . . occurred—
> - (I)  a national of the United States;
> - (II)  a member of the armed forces; or
> - (III)  otherwise an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment.

*Id.* § 1605A(a)(2)(A)(ii). As the Court explains below, both requirements are met here.

First, the United States has long designated Iran as a "country which has repeatedly provided support for acts of international terrorism." 49 Fed. Reg. 2836 (Jan. 23, 1984) (statement of Secretary of State George P. Schultz). So too, has Syria been designated a state sponsor of terrorism for decades. *See Est. of Steinberg*, 2019 WL 6117722, at *2. Thus, both designations were in effect at the time of the attack on Mr. Fuld in 2018. In fact, the Department of State

continues to designate Iran and Syria as state sponsors of terrorism to this day. *See State Sponsors of Terrorism*, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism/ [https://perma.cc/9NTB-HNBT] (last visited Mar. 27, 2024). These designations meet § 1605A's definition of "state sponsor of terrorism." *See* 28 U.S.C. § 1605A(h)(6). Second, all individuals in this case are U.S. nationals.[4] Thus, under the FSIA's terrorism exception, the Court must hear plaintiffs' claims. 28 U.S.C. § 1605A(a)(2)(A).

The Court has determined that it has original jurisdiction, that Iran and Syria are not entitled to sovereign immunity, and that it is required to hear the claims of each of the plaintiffs. Thus, the Court has assured itself of its subject matter jurisdiction in this case.

**B. Personal Jurisdiction**

Federal courts have personal jurisdiction over a foreign state if (1) the court has original jurisdiction pursuant to § 1330(a), and (2) plaintiffs properly effectuate service under § 1608 of the FSIA. *See* 28 U.S.C. § 1330(b). As explained above, § 1330(a)'s requirements for original jurisdiction are met here. *Supra* IV.A.1. The remaining issue is whether plaintiffs adhered to the procedural requirements for service of process in § 1608.

The FSIA prescribes four valid methods of service, listed in order of preference. *Worley*, 75 F. Supp. 3d at 327. If a method of service is unavailable or unsuccessful, a plaintiff may attempt the next method available. *Id.* First, a plaintiff should follow "any special arrangement[s]" for service—e.g., a contractual provision—between the plaintiff and the foreign state. 28 U.S.C. § 1608(a)(1). Second, a plaintiff may serve the defendant state "in accordance with an applicable international convention" on service of process. *Id.* § 1608(a)(2). No such special arrangement or

---

[4] Plaintiffs' motion for default judgment includes birth records and passports of the plaintiffs born outside of the United States as evidence of their U.S. nationality. *Supra* Part III.E.

international convention is applicable here, so neither of those options were available. *Cf. Braun*, 228 F. Supp. 3d at 78.

As a result, plaintiffs attempted service on Iran and Syria under the third option, § 1608(a)(3), which required mailing the requisite documents to Iran and Syria. *See* ECF Nos. 8, 9; *Fuld II*, ECF Nos. 9, 10; 28 U.S.C. § 1608(a)(3) (permitting service by serving copies of the complaint, summons, and notice of suit on a defendant state's "head of the ministry of foreign affairs"). When that failed, plaintiffs resorted to the fourth and final service method by requesting to serve Iran and Syria through diplomatic channels, as permitted by § 1608(a)(4). *See* ECF Nos. 11, 12; *Fuld II*, ECF No. 12. The Clerk of the Court mailed these documents in *Fuld I* on April 5, 2021 and in *Fuld II* on July 16, 2021. ECF No. 14; *Fuld II*, ECF No. 13. According to the Department of State, in *Fuld I*, these documents were served under cover of diplomatic note to Iran on March 1, 2022, ECF No. 15 at 1, and to Syria on April, 21, 2022, ECF No. 18 at 1. In *Fuld II*, documents were served under cover of diplomatic note to Iran on March, 2, 2022, ECF No. 15 at 1, and to Syria on April 21, 2022, ECF No. 18 at 1. Reviewing the filings in these cases, the Court concludes that plaintiffs have complied with § 1608(a)(4) and have properly served Iran and Syria in accordance with the FSIA. Thus, the Court may exercise personal jurisdiction over the parties.

### C. Time Limitations

Time limitations do not preclude the Court from assessing the defendants' liability here. Actions under § 1605A "may be brought or maintained" only if filed "not later than" (1) "10 years after April 24, 1996," or (2) "10 years after the date on which the cause of action arose." 28 U.S.C. § 1605A(b). Thus, it appears that plaintiffs' action is timely. Even if that were not the case, limitations under the FSIA's terrorism exception have long been treated as nonjurisdictional

affirmative defenses that may be waived if not timely asserted by a defendant. *See Worley*, 75 F. Supp. 3d at 328–31. The Court has no authority to enforce time limitations *sua sponte*. *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1112 (D.C. Cir. 2019) ("We conclude that no such authority exists for a federal court to raise the FSIA terrorism exception's statute of limitations on behalf of an entirely absent defendant."). Because Iran and Syria chose to ignore this suit, the Court need not assess time limitations here.

### D. Estate-Plaintiff Standing

The main plaintiff in this action is an estate. The Estate of Ari Fuld brings a right of action not just for the decedent's death but also for the pain and suffering he experienced after the stabbing but before he died. Pls.' Mem. 35–36. In FSIA cases, the Court must evaluate whether estate plaintiffs who bring claims for injuries suffered during the decedent's life have standing. *See Worley*, 75 F. Supp. 3d at 333 ("These [estate] plaintiffs must establish their standing before they may recover for harms suffered during the decedent's lives."); *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12 (D.D.C. 2011) (noting that "recovery for pain and suffering . . . is not universally available to estate-plaintiffs"). Whether an estate may maintain a cause of action for injuries suffered during the decedent's life is a question that is "governed by the law of the state which also governs the creation of the estate." *Worley*, 75 F. Supp. 3d 311, 333 (quoting *Taylor*, 811 F. Supp. 2d at 12).

The Estate of Ari Fuld is governed by New York law. *Fuld II*, Compl. ¶ 9; Miriam Fuld Decl. ¶ 2. While plaintiffs neglected to provide the Court with evidence of New York law, the Court will take judicial notice of its analysis in *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 83 (D.D.C. 2010). There this Court acknowledged:

> The ability for a New York estate or representative to bring a personal injury action belonging to the decedent is governed by New York's Estates, Powers and Trusts

Law. The relevant provision provides: "No cause of action for injury to person . . . is lost because of the death of the person in whose favor the cause of action existed. For any injury an action may be brought . . . by the personal representative of the decedent." N.Y. E.P.T.L. § 11-3.2. As the New York Court of Appeals very recently made clear, this provision ensures that "all tort and contract actions that belonged to a decedent may now be maintained by the estate's personal representative." *Heslin v. County of Greene*, 923 N.E.2d 1111, 1114 n. 4 (N.Y. 2010).

*Id.* Accordingly, Ari Fuld's cause of action under §1605A survives to his estate.[5]

### E. Liability

The Court now turns to the defendants' liability. To bring their claims, plaintiffs must have a private right of action. The FSIA's state-sponsored terrorism exception provides one such private right of action. 28 U.S.C. § 1605A(c). Actions under that exception are only available to (1) U.S. nationals, (2) members of the armed forces, (3) employees of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, and (4) the legal representative of the any of the above-mentioned groups. § 1605A(c). All plaintiffs here are U.S. nationals or the legal representatives of a U.S. national. Accordingly, the Court will assess the liability of Iran and Syria under the FSIA's private right of action.

#### 1. FSIA Liability

Defendants are liable under the FSIA's private right of action for state sponsors of terrorism. 28 U.S.C. § 1605A(c). Liability under the FISA's terrorism exception can be boiled down to five elements. Under FSIA's terrorism exception, foreign states are liable for: (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material

---

[5] Even if Mr. Fuld's estate were governed by Israeli law, his cause of action would still survive. *See Roth*, 78 F. Supp. 3d at 398 ("Israeli statutory law provides that a deceased tort victim's right to recover for injuries suffered during life passes to his or her estate." (citing Civil Wrongs Ordinance (New Version) § 19, 5728–1968, 2 LSI (New Version) 5 (1972) as amended (Isr.)).

support or resources for such an act" where (2) the act was committed, or the material support was provided, by the foreign state or agent of the foreign state, and the act (3) caused (4) personal injury or death (5) "for which courts of the United States may maintain jurisdiction under this section for money damages." *Id.* § 1605A(a)(1), (c).

However, "as a general matter it is not enough that FSIA plaintiff simply lay out the five elements of liability under the state-sponsored terrorism exception." *Rimkus*, 750 F. Supp. 2d at 175. Instead, to satisfy the causation and "personal injury or death" requirements of § 1605A(c)— elements three and four—courts have traditionally required plaintiffs to "articulate the justification for such recovery, generally through the lens of civil tort liability." *See id.* at 176; *but see Est. of Farhat*, 2024 WL 706971, at *18 (explaining how some courts have "collapsed the inquiries of jurisdiction and liability into one" and consider liability to automatically follow from a court's assessment that it has jurisdiction). In other words, plaintiffs must "prove a theory of liability under which defendants cause the requisite injury or death." *Valore*, 700 F. Supp. 2d at 73.

In assessing plaintiffs' theories, courts look to existing law. *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009) (Lamberth, J.) [hereinafter *Heiser II*] ("[B]ecause the FSIA instructs that 'the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances,' 28 U.S.C. § 1606, it in effect instructs federal judges to find the relevant law, not to make it.") (quoting *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003)). To find that law, courts look to "sources such as state decisional law, legal treatises, or the Restatements in order to find and apply what are generally considered to be the well-established standards of state common law." *Heiser II*, 659 F. Supp. at 24 (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability).

To start, plaintiffs have satisfied each of the five elements of § 1605A(c). *See supra* IV.A. Plaintiffs do not explicitly set forth a common law theory of recovery for the Estate of Ari Fuld, but the Court will not "exalt form over substance to dismiss plaintiff's action." *Rimkus*, 750 F. Supp. 2d at 176 ("The fact that plaintiff does not expressly set forth a prototypical common law cause of action will therefore not defeat his claim for relief."). Instead, the Court can "locate an obvious theory of recovery." *Id.* at 183–84. Here, wrongful death is such a theory. Plaintiffs' Complaint, while not explicitly articulating a theory of wrongful death, does acknowledge wrongful death as a tort available under § 1605A(c). *See* Compl. ¶ 7. Under this theory, decedent's heirs at law, through the decedent's estate, may bring a wrongful death action under section 1605A(c) "for economic losses which result from a decedent's premature death." *Valore*, 700 F. Supp. 2d at 78 (internal citation omitted). Where defendants are liable for a decedent's extrajudicial killing or for providing material support for that killing, as is the case here, defendants may be held "liable for the economic damages caused to decedents' estates." *Id.* Thus, Mr. Fuld can sufficiently establish a wrongful death theory of recovery against defendants.

Plaintiffs' complaints also set forth intentional infliction of emotional distress ("IIED') as a common law theory of recovery for the family member plaintiffs—Harvey Jonas Yonah Fuld, Mary Alice Fuld, Daniel Yaakov Fuld, Eytan Fuld, Hillel Chaim Shlomo Fuld, Miriam Fuld, N.F., Naomi Fuld, Tamar Fuld, and Eliezer Yakir Fuld. Compl. ¶¶ 104–109; *Fuld II* Compl. ¶¶ 104–109. These family member plaintiffs bring claims for loss of solatium and IIED. However, "'solatium[ ] . . . is not an independent cause of action, but rather is a form of damages' that is available to IIED claimants." *Maalouf v. Islamic Republic of Iran*, 514 F. Supp. 3d 280, 287 (D.D.C. 2021) (quoting *Reed v. Islamic Republic of Iran*, 439 F. Supp. 2d 53, 67–68 (D.D.C. 2006)). Thus, the Court will apply the standards for IIED to assess defendants' liability to the

family member plaintiffs. *See Valore*, 700 F. Supp. 2d at 85 (citing *Heiser II*, 659 F. Supp. 2d at 27 n.4). Under that theory: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Restatement (Second) of Torts § 46(1) (Am. L. Inst. 1965).

Although claimants were not the direct recipient of the "extreme and outrageous conduct," the Restatement nonetheless permits recovery if (1) they are members of a victim's immediate family and (2) they are present at the time, or "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present." *Heiser II*, 659 F. Supp. 2d at 26–27 (quoting Dan B. Dobbs, The Law of Torts § 307, at 834 (2000)); *see also* Restatement (Second) of Torts § 46, cmt. l (leaving "open the possibility of situations in which presence at the time may not be required"). This Court strictly construes the "immediate family" requirement in FSIA cases; generally, only spouses, parents, siblings, and children are entitled to recover. *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2010) (citing Restatement (Second) of Torts § 46(2)(a)). Not so for the presence requirement. An individual "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." *Valore*, 700 F. Supp. 2d at 80. This is because terrorism is so clearly extreme and outrageous that it is often intended to inflict severe emotional harm even on those who were not present at the site of the act. *Id.*

Here, plaintiffs are all either the spouse, parents, siblings, or children of Ari Fuld—and thus satisfy IIED's immediate family requirement. Pls.' Mem. 36–83. Further, defendants' conduct was extreme, outrageous, and intended to cause emotional distress. As the Court has acknowledged before, plaintiffs are not hard pressed to demonstrate "extreme and outrageous conduct" or "severe

emotional distress" in the case of terrorism. *See Belkin*, 667 F. Supp. 2d at 22 ("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress.") (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)). Indeed, the family member plaintiffs have each submitted uncontroverted affidavits and other evidence outlining the severe distress and psychological trauma they suffered as a consequence of defendants' actions and fleshing out their right to relief. *See supra* Part III.E. Thus, applying general IIED tort law principles in the FSIA context, the Court concludes that the family member plaintiffs can sufficiently establish defendants' liability.

## V.    DAMAGES

Having made factual findings and legal conclusions that establish defendants' liability for plaintiffs' injuries, the Court now decides the amount of damages to which plaintiffs are entitled.

To recover damages, "a FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Est. of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 242–43 (D.D.C. 2012) (quoting *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 160 (D.D.C. 2009)). Damages available under § 1605A "include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Accordingly, deceased plaintiffs' estates can recover economic losses stemming from the wrongful death of the decedent; family members can recover solatium for their emotional injuries; and all plaintiffs can recover punitive damages. *Valore*, 700 F. Supp. 2d at 83. The estate of a deceased victim may also recover damages for pain and suffering if it can be proved that the decedent experienced pain and suffering prior to their death. *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112 (D.D.C. 2000). Further, in appropriate cases, plaintiffs may recover prejudgment interest on their compensatory damages awards. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F.

31

Supp. 2d 48, 86 (D.D.C. 2011). Finally, a court may award post-judgment interest against a foreign sovereign when the FSIA provides jurisdiction. *See, e.g., Schooley v. Islamic Republic of Iran*, No. 17-cv-1376 (BAH), 2019 WL 2717888, at *79 (D.D.C. June 27, 2019).

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003)) (internal quotation marks omitted). As discussed in Part IV, plaintiffs have proven that the defendants' provision of material support and resources for an extrajudicial killing was reasonably certain to—and indeed intended to—cause injury to plaintiffs. As to the issue of a reasonable estimate of damages, in cases brought under section 1605A, a court may consider prior damage awards for pain and suffering and solatium as examples for determining an appropriate award for each plaintiff. *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

### A. Pain and Suffering

Plaintiffs here seek damages for pain and suffering. The Court acknowledges that "it is 'undeniably difficult' to assess the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks." *Brewer*, 664 F. Supp. 2d at 57 (quoting *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 59 (D.D.C. 2006)). Thus, to determine damages for pain and suffering, courts rely on a variety of factors, including "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d

44, 46 (D.D.C. 2012) (internal citation and quotation marks omitted). Plaintiffs who were killed in the attack giving rise to the cause of action cannot receive an award for pain and suffering if their death was instantaneous. *Elahi*, 124 F. Supp. 2d at 112. Indeed, a court cannot award damages for pain and suffering if the plaintiff fails to prove that the decedent consciously experienced the time between an attack and her death. *Est. of Botvin*, 873 F. Supp. 2d at 244.

To quantify damages for pain and suffering the Court looks to its decision in *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007). There, this Court adopted a general procedure for the calculation of damages that begins with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages. *Id.* at 54. However, the Court will "depart upward from this baseline to $7–$12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," and will "depart downward to $2–$3 million where victims suffered only minor shrapnel injuries or minor injury from small-arms fire." *Valore*, 700 F. Supp. 2d at 84. Finally, courts typically award $1 million to a victim who only survives a few minutes to a few hours after a bombing. *See Elahi*, 124 F. Supp. 2d at 113.

The Estate of Ari Fuld seeks damages for his pain and suffering before death. Plaintiffs have submitted evidence that upon being stabbed Mr. Fuld did not die immediately, but rather chased and subdued his attacker before collapsing from his own wounds. Pls.' Mem 35. Plaintiffs evidence indisputably shows that Mr. Fuld was conscious for a period of time directly after the attack and prior to his death in the ambulance on the way to the hospital. *See id.*; Miriam Fuld Decl. ¶ 46. To be sure, it is unclear exactly how much time elapsed between when Mr. Fuld was

stabbed and when he died—however no evidence suggests that it was more than one hour.[6] So, too, is it unclear how severe Mr. Fuld's pain was following the attack. Of course, the Court can reasonably surmise that he was in substantial pain given the brutal nature of the attack and the large blade used by the terrorist. *See supra* Part III.B. Even so, the Court will assume that Mr. Fuld's pain and suffering was no worse than others who survive for a few minutes to a few hours after a terrorist attack. *See Elahi*, 124 F. Supp. 2d at 113. Thus, the Court will award the Estate of Ari Fuld pain and suffering damages of $1 million.

### B. Economic Loss

Plaintiffs also request economic damages. Economic loss damages can be recovered pursuant to section 1605A(c). While economic loss can never be predicted with exact certainty, such damages may be proven by the submission of a forensic economist's expert report. *Belkin*, 667 F. Supp. 2d at 24. In considering an award for lost future earnings, the Court shall take into account the reasonableness and foundation of the assumptions relied upon by the expert. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012).

Here, the Estate of Ari Fuld seeks damages for economic losses accruing to his estate. Pls.' Mem. 34. In support of the request for economic loss damages, plaintiffs have submitted the expert report of Chad L. Staller and Stephen M. Dripps, President and Senior Economist/Manager respectively at the Center for Forensic Economic Studies ('CFES"). Ari Econ. Loss Rep. The CFES is an organization whose forensic economics expertise has been acknowledged by courts in this jurisdiction on several occasions. *See, e.g.*, *Est. of Botvin*, 873 F. Supp. 2d at 242–43

---

[6] Plaintiffs include a report indicating Mr. Fuld's time of injury as either 10:38 or 10:58 am, ECF No. 27-2, Exhibit D. However, plaintiffs also link to a video placing his time of injury as closer to 10:53 am. Pls.' Mem 34. As for Mr. Fuld's time of death, plaintiffs' evidence suggests that Mr. Fuld died while he was being treated in the ambulance on the way to the hospital. Miriam Fuld Decl. ¶ 46. Thus, he died sometime before he was admitted to the hospital emergency room at 11:37 am. ECF No. 27-2, Exhibit D at 3.

("[P]laintiffs have appropriately provided the court with an expert report . . . submitted by the Center for Forensic Economic Studies."); *Est. of Steinberg*, 2019 WL 6117722, at *8 (recognizing president of CFES as "an expert on forensic economics.").

Using reasonable assumptions and reliable calculations—based on economic models and government data—the CFES report gives a range of potential economic loss damage awards. Ari Econ. Loss Rep. These awards differ based on whether Mr. Fuld would have worked until the ages of 65.4, 67, or 70. *Id.* With no evidence to the contrary, given Miriam Fuld's statement that Mr. Fuld would have worked "long past the retirement age, probably until he stopped breathing," the Court shall assume that Mr. Fuld would have worked until age 70. Miriam Fuld Decl. ¶ 42. On these assumptions, the Court concludes that the Estate of Ari Fuld shall receive an economic loss damages award at the upper range of the CFES report—$669,801. Ari Econ. Loss Rep. 11.

Miriam Fuld also seeks economic damages. Pls.' Mem. 64. In support of her request for economic loss damages, plaintiffs have submitted multiple reports, including reports with medical evidence sufficiently linking Miriam's injuries to her economic losses. First, plaintiffs submit the reports of Dr. Hadassa T. Billet Jacobson and Aviva Danziger. Jacobson Rep., ECF No. 27-2, Exhibit A.; Danziger Rep., ECF No. 27-2, Exhibit B.[7] Those reports describe in detail the mental and physical injuries that Miriam has endured in the aftermath of Mr. Fuld's murder. Most notably, Dr. Jacobson reports that, because of those injuries, Miriam may not "be truly ready to return to work for quite some time, if ever." *Id.*

---

[7] Dr. Jacobson is a clinical psychologist, with 20 years of clinical experience, who has met with Miriam Fuld several times since Mr. Fuld's murder. Jacobson Rep. 24. Aviva Danziger is a pain and trauma specialist, with a decade of experience, who has been treating Miriam for years in the aftermath of Mr. Fuld's death. Danziger Rep. 27. The Court has examined each of their credentials and the content of their reports and finds them each qualified to testify to the matters below.

Plaintiffs have also submitted another CFES expert report from Staller and Dripps to quantify Miriam's economic damages. Miriam Econ. Loss Rep., ECF No. 27-12. That report considers the cost of Miriam's treatments, the reports from Dr. Jacobson and Danziger, and other factors to gives a range of potential economic loss. *Id.* These estimates differ based on whether Miriam would have worked until the ages of 62, 64.8, or 70. *Id.* With no evidence to the contrary and given Miriam Fuld's statement that—were it not for Mr. Fuld's murder—she probably would have worked "long past the retirement age," the Court shall assume that Miriam Fuld would have worked until age 70. Miriam Fuld Decl. ¶ 42. On these assumptions, the Court concludes that Miriam Fuld shall receive an economic loss damages award at the highest end of the CFES report estimate—$642,936. Miriam Econ. Loss Rep. 8.

### C. Solatium Damages

Solatium under the FSIA is functionally identical to IIED. *Id.* It is a form of damages intended to compensate persons for "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent's society and comfort." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011) (internal citation and quotation marks omitted). Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 30 (D.D.C. 1998) (discussing solatium damages under the prior version of the statutory state-sponsored terrorism exception to foreign sovereign immunity). As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages. *Id.*

This Court developed a standardized approach for evaluating IIED claims for solatium damages in *Estate of Heiser*, where it surveyed past awards to family members of those who lost

their lives to terrorism and determined that, based on averages, "[s]pouses typically receive greater damage awards than parents, who, in turn, typically receive greater awards than siblings." *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) [hereinafter *Heiser I*]. Relying upon its evaluation of past average awards, that framework awarded valid claims brought by spouses, parents or children, and siblings $8 million, $5 million, and $2.5 million each, respectively. *Id.*; *see also Valore*, 700 F. Supp. 2d at 85 (observing that this framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror).

In applying this framework, however, courts must be wary that "[t]hese numbers . . . are not set in stone," *Murphy*, 740 F. Supp. 2d at 79, and that deviations may be warranted when, for example, "evidence establish[es] an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant [is presented]; and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27.

The following ten members of Ari Fuld's family seek solatium damages for IIED: his parents—Harvey Jonas Yonah Fuld and Mary Alice Fuld; his siblings—Daniel Yaakov Fuld, Eytan Fuld, and Hillel Chaim Shlomo Fuld; his widow—Miriam Fuld; and his children—N.F., Naomi Fuld, Tamar Fuld, and Eliezer Yakir Fuld. Pls.' Mem 37–38. After considering plaintiffs' evidence, the Court concludes that each member of the Fuld family has sufficiently demonstrated the sort of personal connection with Ari Fuld and mental anguish resulting from his death to support an award of solatium damages. However, the Court concludes that it shall not make an upward or downward departure from the normal solatium framework applied in state-sponsored

terrorism cases. The circumstances of this attack and the relationships each family member had with Mr. Fuld, do not demonstrate an unusual degree of mental anguish that would compel deviations from the typical damages award in state-sponsored terrorism cases.

Therefore, the Court concludes that Ari Fuld's parents, Harvey Jonas Yonah Fuld and Mary Alice Fuld, shall receive $5 million each; his widow, Miriam Fuld, shall receive $8 million; his siblings, Daniel Yaakov Fuld, Eytan Fuld, and Hillel Chaim Shlomo Fuld, shall receive $2.5 million each; and his children, N.F., Naomi Fuld, Tamar Fuld, and Eliezer Yakir Fuld, shall receive $5 million each in solatium damages.

### D. Punitive Damages

Plaintiffs also seek punitive damages. Pls. Mem. 83–87. Punitive damages serve to punish and deter the actions for which they are awarded, rather than to compensate the victim. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 61. In determining the proper punitive damages award, courts evaluate four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Acosta*, 574 F. Supp. 2d at 30 (citing Restatement (Second) of Torts § 908)). Plaintiffs here seek one billion dollars in punitive damages. Compl. 25. While the Court believes that punitive sanctions are warranted in this case, it does not accept plaintiffs' enormous proposed amount.

Courts in this district have developed three primary methods of calculating punitive damages in FSIA cases. The first approach involves multiplying the foreign state's "annual expenditures on terrorism" by a factor between three and five. *See Valore*, 700 F. Supp. 2d at 87–88. The second approach awards a fixed amount of $150 million per affected family. *See Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008). The third approach involves

multiplying the total compensatory damages award by a factor of between one and five. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 73 (D.D.C. 2015). A multiplier of three is typical when a court finds that there are no exceptional circumstances in a case. *See Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 106 (D.D.C. 2017). The multiplier approach is especially appropriate when the defendants "did not directly carry out the attack, but funded [a proxy actor], [and] it is doubtful whether a large amount . . . would have the deterrent effect that it might have had in times past." *Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19, 28 (D.D.C. 2017) (quoting *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 26 (D.D.C. 2016)).

Here, the nature of the defendants' acts is reprehensible and the extent of the harm they caused cannot be understated. Defendants, once again, intentionally supported and encouraged a proxy actor who specifically sought to inflict violence upon innocent civilians. *See supra* Part III. If the terrorist was not stopped by Mr. Fuld, he would have killed more innocent civilians. *Id.* While Mr. Fuld's heroism is certainly laudable, the circumstances of his murder were not exceptional. Defendants have sponsored numerous terrorist attacks in the Middle East, including one where American civilians were brutally decapitated, *Gates*, 580 F. Supp. 2d at 56, and another where an infant was slaughtered, *Braun*, 228 F. Supp. 3d at 69. Plaintiffs' evidence does not suggest that this attack was more heinous than those. Defendants' conduct here, despicable as it was, constituted their usual brand of cruelty. Thus, this case fits more squarely within the line of cases awarding punitive damages as a multiplier of compensatory damages.

Given that punitive damages calculated as "a multiplier of three" of the compensatory damages is "the usual practice in state sponsored terrorism cases," *see Roth*, 2018 WL 4680270, at *17, and that plaintiffs have not offered a reason to depart from this practice, this Court concludes that the plaintiffs are entitled to punitive damages in the amount three times the

compensatory damages, to be apportioned according to each plaintiff's share of the compensatory damages. *See id.* (awarding punitive damages equal to three times compensatory damages for Syria and Iran's sponsorship of a bombing in Jerusalem); *Gill*, 249 F. Supp. 3d at 105–06 (awarding punitive damages equal to three times compensatory damages for plaintiffs injured in a shooting in Israel); *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 50–51 (D.D.C. 2012) (using a three times multiplier in a case involving a terrorist bombing).

### E. Prejudgment Interest

Next, the Court will address plaintiffs' request for prejudgment interest to be applied to their damages award. "[W]hether pre-judgment interest is to be awarded is subject to the discretion of the court and equitable considerations." *Motion Picture Ass'n of Amer., Inc. v. Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992). Prejudgment interest may be awarded on compensatory damages but there are limitations on when such awards are appropriate. First, prejudgment interest should not be added to economic loss damages when such awards are already discounted to present value because this would result in double counting of the interest multiplier. *Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 185–86 (D.D.C. 2013). Also, this Court has consistently declined to award prejudgment interest on solatium damage awards calculated according to the *Heiser* framework outlined above. *Oveissi*, 768 F. Supp. 2d at 30 n. 12 (concluding that prejudgment interest was not warranted for solatium damages because the values set by the *Heiser* scale "represent the appropriate level of compensation, regardless of the timing of the attack.").

Plaintiffs' complaint requests prejudgment interest. *See* Compl., Prayer for Relief ¶ d. However, in their motion for default judgment, plaintiffs do not explicitly mention prejudgment interest. *See* Pls.' Mem. In any event, the Court concludes that it cannot award such interest. First, the economic loss damages awarded to the Estate of Ari Fuld and to Miriam Fuld have already

been discounted to present value. *See* Ari Econ. Loss Rep.; Miriam Econ. Loss Rep. Second, the Court does not award prejudgment interest on solatium damage awards that are based on the *Heiser* framework. Finally, as to damages for pain and suffering, plaintiffs provide no persuasive reason, or really any reason at all, for the Court to exercise its discretion to award prejudgment interest on those damages—especially in light of their already substantial damages award. Thus, the Court does not find any equitable grounds for awarding pre-judgment interest in this case.

### F.  Post-Judgment Interest

Finally, plaintiffs request post-judgment interest. See Compl., Prayer for Relief ¶ d; Pls.' Mem. 87–88. A court may award post-judgment interest against a foreign sovereign when the FSIA provides jurisdiction. *See, e.g., Schooley v. Islamic Republic of Iran*, No. 17-cv-1376 (BAH), 2019 WL 2717888, at *79 (D.D.C. June 27, 2019) (awarding post-judgment interest because "[a]pplication of section 1961(a) is mandatory, not discretionary"). By federal statute, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court[,]" and that "[s]uch interest shall be calculated from the date of the entry of judgment." 28 U.S.C. § 1961(a). Because the Court has jurisdiction, *supra* Part IV, and because application of section 1961(a) is mandatory, the Court will—indeed must—award post-judgment interest at the statutory rate.

### VI.  CONCLUSION

The stabbing attack that killed Mr. Fuld was a tragic event and money cannot fully account for the harm that these defendants have inflicted. Iran and Syria have, once again, provided material support to Hamas and thereby facilitated the savage murder of a husband, father, son, and brother to these plaintiffs. The Court's ruling today cannot erase plaintiffs' pain, but it can begin the process of affording them due compensation for their loss.

For the reasons outlined above, the plaintiffs' motion for default judgment will be **GRANTED**. Iran and Syria are jointly and severally liable for the death of Ari Fuld and the injuries to the family member plaintiffs on all claims. The plaintiffs are awarded monetary damages in the following amounts: the plaintiffs are entitled to $143,438,211 in punitive damages in the proportions set forth in the Court's accompanying Order; The Estate of Ari Fuld is entitled to $1,000,000 in pain and suffering damages and $669,801 in economic damages; Miriam Fuld is entitled to $642,936 in economic damages and $8,000,000 in solatium damages; Ari Fuld's parents, Harvey Jonas Yonah Fuld and Mary Alice Fuld, are each entitled to $5,000,000 in solatium damages; Ari Fuld's children, N.F., Naomi Fuld, Tamar Fuld, and Eliezer Yakir Fuld, are each entitled to $5,000,000 in solatium damages; and Ari Fuld's siblings, Daniel Yaakov Fuld, Eytan Fuld, and Hillel Chaim Shlomo Fuld, are each entitled to $2,500,000 in solatium damages. Thus, the total damages award is $191,250,948.

A separate and consistent Order shall issue this date.

Date: March 27 2024

Royce C. Lamberth
United States District Judge